## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.    21-cr-00493 (EGS)** |
| **EDWIN GARCIA-SALMERON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

### Introduction

On March 16, 2022, this Honorable Court will sentence Mr. Garcia-Salmeron for one count of Disorderly Conduct, in violation of 22 D.C. Code § 1321(a)(1); one count of Unlawful Entry, in violation of 22 D.C. Code § 3302(a)(1); and one count of Malicious Destruction of Property, in violation of 22 D.C. Code § 303.  Mr. Garcia-Salmeron respectfully requests that, after considering all the relevant sentencing factors, including 18 U.S.C. § 3553(a), the Court impose a sentence of 30 days' incarceration, all suspended, with 364 days of probation. Additional conditions of supervision should include mental health and substance abuse treatment, as this Court deems appropriate.

### RELEVANT FACTS AND BACKGROUND

On May 25, 2020, a police officer kneeled on George Floyds' neck for almost nine minutes until the life drained out of him, and he was no longer able to articulate that he wanted his mother and could not breathe.[1]  The impetus of his murder was the suspicion that Mr. Floyd

---

[1]     *See* Evan Hill, et. al., *How George Floyd Was Killed in Police Custody*, The New York Times (published May 31, 2020, updated Jan. 24, 2022), available at https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html.

attempted to pass a counterfeit $20 bill at a local convenience store in Minneapolis.[2]  Two

months' prior, Breonna Taylor, an emergency room technician, was struck and killed by five

bullets after Louisville police officers, conducting a nighttime search warrant, broke her front

door off its hinges and indiscriminately fired shots into her apartment while she slept.[3]  Just one

month after her death, and a month before George Floyd's, a 25-year-old Black man was jogging

in a Georgia neighborhood when white vigilantes, one of whom formally worked as an

investigator in the District Attorney's Office, hunted down and murdered Mr. Arbery.[4]  And

these incidents followed the notable and explosive unrest that resulted from the shootings of

Trayvon Martin, age 17, in 2012, and Michael Brown, age 18, in 2014, among others.[5]  To many

in the United States, there appeared to be a steady and alarming drum beat of law enforcement

officials targeting and killing unarmed Black civilians.

　　　　On May 25, 2020, the same day as George Floyd's death, the bystander video depicting

his murder went viral.[6]  And in the following days, protests in Minneapolis and around the

---

[2]　　*Id*.

[3]　　*See* Richard Oppel, Jr. et. al., *What to Know About Breonna Taylor's Death*, The New York Times (Apr. 26, 2021), available at https://www.nytimes.com/article/breonna-taylor-police.html.

[4]　　*See* Richard Fausset, *What We Know About the Shooting Death of Ahmaud Arbery*, The New York Times (Feb. 7, 2022), available at https://www.nytimes.com/article/ahmaud-arbery-shooting-georgia.html.

[5]　　*See* Darran Simon, *Trayvon Martin's death sparked a movement that lives on five years later*, CNN (Feb. 26, 2017), available at https://www.cnn.com/2017/02/26/us/trayvon-martin-death-anniversary/index.html.

[6]　　*See* Derrick Taylor, *George Floyd Protests: A Timeline*, The New York Times (Jun. 2, 2020), available at https://web.archive.org/web/20200602235547/https://www.nytimes.com/article/george-floyd-protests-timeline.html.

country, including Washington, D.C., ignited.[7]  On May 29, protestors gathered outside the

White House, calling for police reform and a response to the unarmed killings of Black and

Brown people in the United States.  For a time, the protest was peaceful, but as the night

progressed, some of the protestors crossed temporary barricades near the East Wing of the White

House, causing the then-president of the United States, President Trump, to seek shelter in an

underground bunker.[8]  His shelter-seeking was widely reported to have embarrassed President

Trump, and was the drive for a decision to expand the White House security perimeter to include

nearby Lafayette Park.[9]  However, on successive evenings, the decision to widen the security

perimeter to include a public park, seemed to only inflame tensions between law enforcement

and the demonstrators.

Then, on May 31, 2020, demonstrators began to loot and vandalize private businesses in

D.C.  At around 10:00 p.m., a basement room of a historic church, adjacent to Lafayette Park,

was set ablaze.  Fortunately, the church sustained just minor damage from the fire, reporting only

a basement room destroyed, and no injuries to individuals or historical items.[10]  However, the

chaotic and damaging protests continued to spill over into neighboring blocks, including the

Starbucks located at 901 15th Street Northwest.

---

[7]      *Id.*

[8]      *Id.*

[9]      *See* Rebecca Tan et. al., *Night of destruction across D.C. after protesters clash with police outside White House*, The Washington Post (June 1, 2020), available at https://www.washingtonpost.com/local/dc-braces-for-third-day-of-protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-b473-04905b1af82b_story.html.

[10]      *See* Sarah Bailey, *St. John's Episcopal Church, historic church next to the White House, set on fire during protests*, The Washington Post (June 5, 2020), available at https://www.washingtonpost.com/religion/2020/06/05/st-johns-episcopal-church-historic-church-next-white-house-set-fire-during-protests/.

Starbucks, having anticipated the unrest, precipitously closed the location and hired a contractor to board up the building's windows to protect it from damage.  Simultaneous with the fire ignition at St. John's Church, the hired Starbucks contractor, having just finished boarding up one side of the building, began to start on the other side.  However, protestors from Lafayette Park and the church were soon pushed to his location, and at around 10:20 p.m., the contractor fled, leaving behind his materials.[11]  At around 10:40 p.m., those same abandoned materials were used by demonstrators to breach the Starbucks' windows and doors.  Several individuals made entry into the Starbucks and set fires, and at approximately 10:42 p.m., two females attempted to set fire to a planter box outside.  When that attempt was unsuccessful, the two women entered the Starbucks.

At around the same time as their entrance, Mr. Garcia-Salmeron also arrived at the Starbucks.  He exited his bicycle and followed the two women inside.  Once inside, the three set, and accelerated, small fires.  One woman sprayed lighter fluid on a trash can fire that was burning when they entered.  Mr. Garcia-Salmeron set fire to wicker baskets that held store products.  The other woman, following behind Mr. Garcia-Salmeron, sprayed lighter fluid on the flames.[12]  The wicker baskets burned for approximately eight minutes before self-extinguishing.

On June 9, 2020, investigators descended on 15th and I Street in an attempt to gather video surveillance to identify suspects in the church fire.  During this gathering, a security guard of a neighboring building alerted law enforcement to the Starbucks fire, even though by that time, over a week had past and Starbucks had repaired much of the damage caused.  Using the

---

[11]     These materials included multiple 2 x 4 wooden boards, loose plywood, a ladder, and a traffic barrel.

[12]     It is not known if the two women were ever identified, arrested, or faced criminal charges for their conduct.

neighboring building's footage, law enforcement was able to identify a distinctive bicycle at the Starbucks, and then using open-sourced social media and in-person surveillance, law enforcement was further able to confirm the bicycle belonged to Mr. Garcia-Salmeron.

On June 26, 2020, the government filed a criminal complaint in U.S. District Court for the District of Columbia alleging that Mr. Garcia-Salmeron committed Arson, in violation of 18 U.S.C. § 844(i).  *See* ECF No. 1.  He was arrested on July 16, 2020.  *See* ECF No. 5.  That same day, Mr. Garcia-Salmeron had an initial appearance and was released, subject to conditions and monitoring by the U.S. Pretrial Services Agency.  *See* ECF No. 7.  On July 27, 2021, Mr. Garcia-Salmeron was charged by information with one count of Arson, in violation of 18 U.S.C. § 844(i); one count of Disorderly Conduct, in violation of 22 D.C. Code § 1321(a)(1); one count of Unlawful Entry, in violation of 22 D.C. Code § 3302(a)(1); and one count of Malicious Destruction of Property, in violation of 22 D.C. Code § 303.  *See* ECF No. 34.  On October 26, 2021, Mr. Garcia-Salmeron entered guilty pleas to the three misdemeanor offenses, with the agreement that the 18 U.S.C. § 844(i) charge would be dismissed at sentencing.  *See* ECF Nos. 38-40.  This Court accepted the pleas, referred Mr. Garcia-Salmeron to U.S. Probation for a Presentence Investigation, and set his sentencing for March 16, 2022.  *See* Minute Entry (Oct. 26, 2021).

## APPLICABLE LEGAL PRINCIPLES

Mr. Garcia-Salmeron entered guilty pleas to three misdemeanor offenses under the District of Columbia's Criminal Code (D.C. Code).  Because his guilty pleas involve D.C. Code offenses and not federal violations, the United States Sentencing Guidelines are inapplicable and supervised release is not authorized.  Similarly, because all three offenses are misdemeanors, the D.C. Voluntary Sentencing Guidelines are inapplicable.

Instead, the Court is empowered to sentence Mr. Garcia-Salmeron to a period of incarceration up to the maximum for each count[13] and a period of probation not to exceed five years.  In doing so, the Court may completely suspend the imposition of a sentence, impose a sentence but completely suspend its execution, or impose a sentence and suspend a portion of its execution.  *See* 16 D.C. Code §§ 710 and 710(b).  However, this Court remains bound by the sentencing factors enumerated in 18 U.S.C. § 3553(a), which compel it to tailor an individualized sentence that is, "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."

To that end, 18 U.S.C. § 3553(a) instructs the Court to consider the "nature and circumstances of the offense and the history and characteristics of the defendant and the need for the sentence imposed."  To properly determine the "need" for the sentence, the Court should consider if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." *Id*. at 2(A). Additionally, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id*. at 2 (B-D).  Further, the Court must be mindful of "the kinds of sentences available," and avoid unwarranted sentencing disparities. *Id*. at (3), (4) and (6).

---

[13]     Disorderly Conduct, in violation of 22 D.C. Code § 1321(a)(1) carries a maximum penalty of 90 days' imprisonment; Unlawful Entry, in violation of 22 D.C. Code § 3302(a)(1) carries a maximum penalty of 180 days' imprisonment; and Malicious Destruction of Property, in violation of 22 D.C. Code § 303 carries a maximum penalty of 180 days' imprisonment.

**ARGUMENT**

A sentence of 30 days' incarceration, all suspended, with 364 days' of probation, would be a sentence sufficient, but not greater than necessary, to fulfill the purposes enumerated under 18 U.S.C. § 3553(a).  Taking into consideration the context in which Mr. Garcia-Salmeron committed his offenses, his history and characteristics, █████████████, his potential for collateral consequences, █████████████████████ a suspended sentence of 30 days is just.  Further, since Mr. Garcia-Salmeron desires to receive mental health and substance abuse treatment from the U.S. Probation Office, 364 days of supervision is sufficient to facilitate those much-needed services and is consistent with 18 U.S.C. § 3553(a)'s sentencing principles.

I.  **Nature and Circumstances of Mr. Garcia-Salmeron's Offenses**

As previously noted, Mr. Garcia-Salmeron's criminal offenses did not happen in a vacuum, but rather, during a tumultuous and passionate period when Black and Brown people in the United States were desperate to make their voices heard.  In the summer of 2020, major U.S. cities, including Washington, D.C., boiled over with fear as the news continued to show people of color being targeted and victimized by law enforcement.  At times, the collective anger blossomed into beautiful non-violent protests that called for reform.  At other times, the anger wilted into indiscriminate property destruction that did more to distract from the issues, than help solve them.  Mr. Garcia-Salmeron's offense conduct, unfortunately, was in the latter category.

However, though counter-productive to the cause, Mr. Garcia-Salmeron's May 31, 2020, act of defiance is more properly contextualized as an act of desperation, rather than an act of malice.  Six days' prior, Mr. Garcia-Salmeron watched with the world as Officer Derek Chauvin

stood on the neck of George Floyd for almost nine minutes, ignoring his cries for help.[14]

Protests spread around the country and though the murder was recorded from multiple angles, and though law enforcement knew their suspect intimately well, he was still not arrested for four long days. Upon his arrest, then-former Vice President Biden addressed the nation, stating, "With our complacency and silence, we are complicit in perpetuating these cycles of violence."[15]

That same day, May 29, protestors in Lafayette Park breached the security perimeter set up along the White House grounds. President Trump was rushed to an underground bunker for safety. The following evening, the secret service widened the security perimeter, necessarily narrowing the demonstrators' area. And then on May 31, tensions exploded. According to the Washington Post,

> The third day of protests in the nation's capital over George Floyd's death began with bent knees, raised fists and pleas that this night, unlike the last, would remain peaceful. And in those first moments on Sunday, the more than 1,000 people who marched to Lafayette Square across from the White House listened. Then came darkness, and with it, another night of mayhem. In the park, protesters faced the familiar *pop, pop, pop* of pepper bullets and stinging clouds of tear gas meant to push back hundreds of them as they tried, again and again, to break through the police barricades set up around President Trump's home. . . Much like Saturday night, the worst violence didn't erupt until police pushed demonstrators out of Lafayette Square and into the city's streets.[16]

---

[14]   *See* Evan Hill, et. al., *How George Floyd Was Killed in Police Custody*, The New York Times (published May 31, 2020, updated Jan. 24, 2022), available at https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html.

[15]   *See* Ryan Miller, et. al., *Former Minneapolis police officer Derek Chauvin arrested, charged with murder in George Floyd's death: Updates*, USA Today (May 29, 2020), available at https://www.usatoday.com/story/news/nation/2020/05/29/minneapolis-death-george-floyd-protests-escalate-police-precinct-fire/5279830002/

[16]   *See* Rebecca Tan et. al., *Night of destruction across D.C. after protesters clash with police outside White House*, The Washington Post (June 1, 2020), available at https://www.washingtonpost.com/local/dc-braces-for-third-day-of-protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-b473-04905b1af82b_story.html.

Mr. Garcia-Salmeron, witness to, and participant in, the protests near Lafayette Park that evening, saw the shift of the peaceful demonstration.  At first, when officers pushed protestors out of the park, they pushed back, trying to steady and re-group themselves.  However, as the police continued their push, and protestors began to lose ground, the protestors turned to more destructive acts of defiance.  Individuals set fire to trash on the street and nearby dumpsters.  The anger boiled over to the nearby historic church of St. John's, which was also set ablaze.

Continuing on, officers eventually funneled the angry protestors, including Mr. Garcia-Salmeron, down 15th and 16th Streets Northwest, away from the White House, but towards downtown's private businesses.



It was during that period of desperation and losing ground, that Mr. Garcia-Salmeron, having already witnessed other protestors set fires, decided to engage in criminal conduct.  When he was funneled down 15th Street, he came upon the Starbucks located at 15th and I.  He saw that the windows and doors had already been broken out by earlier protestors and he observed two women attempting to set fire to planters just outside.  He noted the women appeared to be giving items to others and in curiosity, he approached them.  The women greeted Mr. Garcia-Salmeron, and he followed them inside the store, lighting wicker baskets on fire.  Sensing that he had crossed a line, Mr. Garcia-Salmeron then fled while the women remained.[17]

Fortunately, his fires were contained in the wicker baskets and self-extinguished.  No one was injured, and the fire department was not asked to respond.  Starbucks, for its part, began to clean up the damage almost immediately.  In fact, Starbucks did not alert law enforcement to its damaged store at all; law enforcement was only told of the fire a full nine days after it happened by an eager security guard of a nearby building.[18]  Seemingly on point with its original position of dispassion, Starbucks has not noted or asked for any restitution in this case.

Notably, when Mr. Garcia-Salmeron was arrested by law enforcement for the offense on July 16, 2020, he immediately waived his *Miranda* rights, and gave a full confession.  He identified himself in surveillance video and admitted to setting fire to the wicker baskets. ███

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

---

[17]     It is not known if the two women were ever located or prosecuted for their offenses.

[18]     It is not known if the government fully identified or charged the individual/s that set fire to St. John's Church.

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

In sum, Mr. Garcia-Salmeron set fire to wicker baskets.  The victim of his crime is not requesting restitution, and the fires were contained and self-extinguished without injuring anyone.  He then proceeded to confess his crimes to law enforcement, █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

## II.    **History and Characteristics of Mr. Garcia-Salmeron**

Mr. Garcia-Salmeron was born in San Miguel, El Salvador in 1995, just a few years after the end of a civil war that resulted in a gang culture, "unmatched for its brutality and scale of violence."[19]  The murder rate in El Salvador remains one of the highest in the world and it is widely regarded as the deadliest place on earth that is not a war zone.  According to foreign policy experts, Salvadorian society is paralyzed with a

> . . .pervasive atmosphere of fear: Anybody can be an informer for a gang, nobody is safe, any street can become a crime scene, anybody can disappear. Public killings are common, accounting for nearly 40 percent of all murders.[20]

As a child, Mr. Garcia-Salmeron remembers bearing witness to this endemic violence; he can viscerally remember seeing lifeless bodies of young men stacked in the streets near his home. It was in that backdrop, when Mr. Garcia-Salmeron was just eight years' old, that his mother,

---

[19]     *See* Tariq Zaidi, *A Nation Held Hostage*, Foreign Policy (Nov. 30, 2019), available at https://foreignpolicy.com/2019/11/30/el-salvador-gang-violence-ms13-nation-held-hostage-photography/

[20]     *Id.*

11

Maria, fled to the United States, hoping to keep her little boy safe.  Helping to sponsor her escape, Maria married an American citizen, Nelson, who became Mr. Garcia-Salmeron's sole father figure and link to the new country.

Shortly after his arrival in the United States, Mr. Garcia-Salmeron enrolled in school and did his best to make his mother proud.  However, his new life was far from perfect: he struggled to learn English, struggled to co-exist with his new step-father who was abusive towards his mother, and the small family struggled to make ends meet.  His mother and step-father both worked in the restaurant industry with jobs that barely provided enough food for their small apartment's table.

Then, when he was in the 11th grade, Mr. Garcia-Salmeron learned he was to become a father.  Feeling intense pressure to financially provide, he withdrew from school and began working in the restaurant industry.  Though Mr. Garcia-Salmeron's and his son's mother's romantic relationship did not survive, the pairs' commitment to co-parenting did.  Now nine years old, Mr. Garcia-Salmeron's son splits his time between his mother and father's homes.  Though limited in his education, Mr. Garcia-Salmeron has continued to work hard over the years, currently employed full-time as a bartender at a local restaurant.  He contributes to the rent at his mother's apartment and uses the remainder of his minimum wage paychecks to provide for his son.

Sadly, in 2017, Mr. Garcia-Salmeron became a victim of violent crime in the District when an unknown man attacked, attempting to rob him.  Mr. Garcia-Salmeron was struck with a metal baseball bat, the impact so forceful that he bit his tongue in half and suffered notable blood loss.  He recovered from that incident but he did not file a police report for fear of retribution, and his attacker was not apprehended.  Then, in 2018, Mr. Garcia-Salmeron was involved in an

altercation after he witnessed a taxicab driver strike his friend riding a bicycle.  In the heat of the moment, and in an attempt to come to his friend's aid, Mr. Garcia-Salmeron made the poor decision to get involved, positioning himself between the taxicab driver and his friend, and resulting in a 2019 conviction for simple assault.  However, that 2019 conviction is Mr. Garcia-Salmeron's only prior conviction, and he previously completed the six months of unsupervised probation imposed by D.C. Superior Court.[21]  In early 2020, when the news reports began to swell with stories of Black and Brown people being victimized by law enforcement and its vigilantes, Mr. Garcia-Salmeron again felt the need to protect others, which is why he attended the White House protest on May 31, 2020.  It was this same desire that fueled his misguided and inappropriate act of civil defiance at the Starbucks.

However, Mr. Garcia-Salmeron is more than just a man that set fire to wicker baskets. He is an individual with an industrious spirit that fled a war-torn nation, and left his education to provide financially for his only son.



.[22]  When he was arrested, he knew there was a possibility Immigration and Customs Enforcement (ICE) would detain him, but still, he confessed.

---

[21]      *See* ECF No. 43 at 9, ¶ 27 (Final Presentence Investigation Report).

[22]      *Id*. at 13, ¶ 42.

████████████████████████████████████████ And though his call-in

compliance has varied over the 20 months while on pretrial supervision, Mr. Garcia-Salmeron

remained in contact with U.S. Pretrial Services, all the while knowing that the agency could float

his location to ICE at any time.  ████████████████ Mr. Garcia-Salmeron displayed while

knowing that he could, at any moment, be placed in removal proceedings, is a testament to his

integrity.  In sum, though Mr. Garcia-Salmeron does not always participate in productive

behavior, he does try very hard to do the right thing and stand up for others.  This Court should

take that into account when crafting his sentence.

## III.    **The Need for the Sentence Imposed**

The Court, through 18 U.S.C. § 3553(a)(2) is also instructed to design a sentence that

reflects the seriousness of Mr. Garcia-Salmeron's offense, promote respect for the law, provide

just punishment, afford adequate deterrence, and protect the public from his future crimes.

However, a suspended sentence with 364 days' probation adequately fulfills those needs.

Certainly, setting fire to a business's property is a serious offense, especially when others

are around the fire and there is the potential for injury.  However, that seriousness must be

measured in context.  In this case, Mr. Garcia-Salmeron set fire to wicker baskets at a closed

Starbucks.  The fires were contained and burned themselves out.  The others in the vicinity of his

fires were also, themselves, setting fires.  The fire department was not called.  No other

businesses or residences were injured.  Starbucks did not even inform the police of the incident.

Simply put, in this case, a sentence involving active incarceration would be unduly harsh and do

little to further respect for the law.  Moreover, the more than 20 months Mr. Garcia-Salmeron

has endured on pretrial release, plus the expected addition of probation, plus the potential

flagging of his presence for removal proceedings, plus three new misdemeanor convictions, more

than satisfies the need for deterrence.  Finally, given Mr. Garcia-Salmeron's prior minimal

criminal history and the historic circumstances that brought about the 2020 Black Lives Matter

protests, it is unlikely the Court needs to prioritize protection of the public from Mr. Garcia-

Salmeron.[23]

Additionally, 18 U.S.C. § 3553(a)(2)(D) implores the Court to consider a sentence that

provides Mr. Garcia-Salmeron "with needed educational or vocational training, medical care, or

other correctional treatment in the most effective manner."  Here, a suspended sentence of 30

days' incarceration with 364 days' probation would do just that.  Mr. Garcia-Salmeron desires

U.S. Probations' services for mental health and substance abuse treatment.  ████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████ If he is placed under the supervision and care of U.S. Probation, Mr. Garcia-

Salmeron can gain access to much needed mental health and substance abuse services.  The 30

suspended days of incarceration will help give Mr. Garcia-Salmeron the extra motivation to

complete the treatments successfully.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[23]     The government agrees.  *See* ECF No. 45 at 2 (Government's Sentencing Memorandum)
(". . . a suspended sentence should deter the defendant from future criminal conduct.")



**Conclusion**

A sentence of 30 days of incarceration, all suspended, and 364 days' probation is sufficient, but not greater than necessary, to comply with the purposes of sentencing in this case. Such a sentence accounts for the nature and circumstances surrounding Mr. Garcia-Salmeron's offense, as well as his history and characteristics.  It acknowledges his acceptance of responsibility, ███████████████████████, his lack of criminal history, and the adequate deterrence he has experienced since his arrest and supervision began in 2020.  Further, it accounts for the unique collateral consequences Mr. Garcia-Salmeron may face as a result of these convictions, and provides for an avenue of treatment and support.  Therefore, after considering all the facts of this case, his individual characteristics, and all the relevant 18 U.S.C.

---

24 ███████████████████████████████████

25       A sentence of less than one year is widely believed to be an advantageous sentence for individuals asserting defenses in removal proceedings. *See* Center for New Americans, The University of Minnesota Law School, *"Convictions" for Immigration Purposes*, available at https://www.law.umn.edu/sites/law.umn.edu/files/chart-convictions-for-immigration-purposes.pdf.

§ 3553(a) factors, Mr. Garcia-Salmeron requests that this Court impose a sentence of 30 days of incarceration, all suspended, with 364 days' probation.


Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
CARA HALVERSON
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Cara_halverson@fd.org